# COURT OF APPEALS OF TEXAS.

## TYLER TERM, 1883.

### [No. 1559.]

### GEORGE MOORE v. THE STATE.

1. MURDER—INDICTMENT.—See the statement of the case for an indictment held sufficient, as containing every requisite of an indictment for murder in the first degree.

2. SAME—EVIDENCE OF CHARACTER OF PARTY ASSAULTED is not, as a general rule, admissible ; but an exception is that, in trials for homicide, where the evidence presents the issue of self-defense, the general character of the deceased may be proved by the defendant to show that he, the defendant, was justified in believing himself in danger of losing his life, or of sustaining serious bodily injury from the deceased. Such proof is admissible when it will serve to explain the actions of the deceased at the time of the killing, which actions should first be established. See the opinion *in extenso* on the question, and note a case wherein it is held that a proper predicate was laid for the introduction of such evidence.

3. SAME—PRACTICE—EVIDENCE—CASE STATED.—It was in proof that, a few minutes before the killing, the deceased and the defendant exchanged angry words, and that the deceased left; that one L., who was present with the defendant, slapped the defendant's shoulder and told him to go ahead, saying that he, L., was with the defendant, and had the money to back him in whatever he might do. *Held*, admissible, without reference to the question whether or not L. was a co-conspirator. See the opinion for a formulation of the rule. Note also the reference in the opinion to other testimony *held* properly admitted under the same rule.

4. SAME—EVIDENCE.—"Persons charged as principals, accomplices or accessories, whether in the same or separate indictments, cannot be introduced as witnesses for one another; but they may claim a severance, and, if any one or more be acquitted, or the prosecution against them be dismissed, they may testify in behalf of the others." The State was properly permitted to introduce in evidence, in order to sustain objections to the competency of the proffered witness, an indictment charging him as a principal in the murder of the deceased. Such indictment, in the absence of a contrary showing, is *prima facie* evidence of the identity of the two transactions, and the trial court had judicial knowledge that the

proposed witness had not as yet been tried upon the indictment. It was competent for the State to show, *aliunde* the indictment, the witness's participation in the act, and thus establish his incompetency to testify in behalf of the defendant.

5. SAME—CHARGE OF THE COURT—EXPRESS MALICE.—See the opinion *in extenso* for charges of the trial court upon the subject of express malice *held* correct as abstract propositions of law, but liable to allow the jury to conclude that they were authorized to infer express malice without proof of such facts as would authorize the inference.

6. SAME—PRACTICE.—See the opinion *in extenso* for a charge of the trial court upon murder in the second degree, *held* deficient in not complying with the rule that "instructions should not be presented in the form of abstract propositions, but should be constructed upon the evidence in the particular case at bar." Nevertheless, as the objectionable charge was not excepted to when given, and no special instruction upon the subject was asked, this court holds the objection not available in the present case.

7. SAME—SELF-DEFENSE.—Homicide is justifiable when the party slain is in the act of committing an unlawful and violent attack upon the party killing, such as is calculated to produce a reasonable expectation or fear of death or some serious bodily injury; and this is true though it should afterwards appear that there was in fact no danger. A requested charge to this effect was refused. *Held*, error, inasmuch as the general charge did not present the principle fully, though the principle was invoked by proof.

8. MANSLAUGHTER—CHARGE OF THE COURT.—See the statement of the case for evidence *held* to so far present the issue of manslaughter as to demand a charge upon that subject. The rule of practice is that when the evidence presents an issue favorable to the defendant, the trial court should not disregard it, but should accord to the accused, freely and fairly, the submission of the issue for the consideration of the jury. Omissions of this character cannot be treated as immaterial.

APPEAL from the District Court of Hunt. Tried below before the Hon. G. J. Clark.

The conviction in this case was upon an indictment against the appellant for the murder of Sam. Boyd, the charging part of which reads as follows:

"That George Moore, late of the county of Hunt, and State of Texas, did, with force and arms, in the county of Hunt and State of Texas, on the third day of January, A. D. 1883, with his malice aforethought, make an assault in and upon the body of Sam. Boyd, a reasonable creature in being, in the peace of God, and our said State, with a certain pistol, loaded and charged with gunpowder and leaden balls, which he, the said George Moore, had and held in his right hand, which said pistol, loaded and charged

as aforesaid, with gunpowder and leaden balls, he, the said George Moore, did shoot off and discharge at, to, against and upon the body of him, the said Sam. Boyd, and thereby, with said pistol as aforesaid, inflicting upon the body of him, the said Sam. Boyd, one mortal wound, of which mortal wound the said Boyd did instantly die," etc. The verdict declared appellant guilty of murder in the first degree, and affixed the punishment at a life term in the penitentiary.

Mack Blair was the first witness for the State. He testified that on January 3, 1883, he was clerking in Bob Blair's saloon, in Commerce, Hunt county, Texas, and saw the difficulty between the defendant and the deceased on that day, which resulted in the death of the latter. The deceased rode up to the front door of the saloon and spoke to the witness, when the defendant called the deceased a d—d liar. At this time, the defendant, and Phelps, Lindley and others were standing together in the saloon. As the deceased rode off, the witness remarked to the defendant: "Boyd was not talking to you." The defendant replied: "It don't make a d—d bit of difference." The witness then told him if he got into a row with the deceased, the deceased would make it a serious one. To this the defendant replied: "That don't make a d—d bit of difference—it is what we want." The witness did not know at which door the defendant left the saloon, but did know that when he and Lindley were talking in the saloon before he went out, Lindley slapped him on the shoulder and said, "Go ahead: I am with you, and have got the money to back you in whatever you do." This was all of the conversation between Lindley and the defendant overheard by the witness, and the witness did not now know how long this was before Moore left the saloon. The witness did not hear the deceased say anything to the defendant at the time.

The witness next saw the defendant with John Lindley, Bob Phelps and others, standing at the back (south) end of the house. The deceased, who was then at the horse rack, rode off southwest toward home, with Mal. Wood. The defendant told the deceased that he, the deceased, was a d—d cowardly son of a b—h, and the witness heard the deceased say "I will go back or die." The witness, who was then in the house, went out and saw the deceased ride at the defendant with his quirt drawn in a striking attitude, and with his left hand grab at the defendant's pistol, which the defendant had drawn. The defendant backed around the corner of the house, between the house and a

woodpile, and while the deceased was still grabbing at the pistol, fired.    The deceased continued grabbing at the pistol of the defendant, when Phelps fired at the deceased's back, and the deceased dropped from the · horse, his body falling on the defendant.    The defendant fired on the deceased twice; once while he was on the horse, and again after he had fallen.    The deceased lived but a few minutes after the last shot.    When the deceased rode off from the front of the saloon his horse's head was turned toward Ablowich's store.    The party were at the rear of the house when the deceased rode up to the defendant.    At that time the deceased said to the defendant:  "I don't know what you can have against me."  The defendant then backed around the. house.    The witness did not know how often the deceased started off and returned.    The distance between the place in front of the saloon, to which the deceased first rode up, and the point where the shooting occurred, was the length of the house.    When the attention of the witness was first directed to the party, the defendant, Lindley, Phelps and several others were standing in the saloon.    The deceased fell two or three feet from the corner of the house, between it and the woodpile.    The defendant was then some eight or ten feet from the side door.    The witness did not see the defendant advance upon the deceased in the house.    He saw the defendant frequently that day, and heard him say that he could kill a man and get a thousand miles away before being caught. He did not hear the defendant say that he was going to leave. When the defendant first came into the saloon and took a drink, on the morning of the homicide, the witness asked him if that was his first drink.    He replied that it was, but "woe unto my last one."    He came into the house alone at that time.    When the defendant denounced the deceased as a liar, Phelps was present, but said nothing.    Witness did not hear the deceased address the defendant at that time.    Bob Long, John Lindley, Riley Lowe, Joe McGrew, Lige Wilkins and several others were present.

Cross-examined, the witness stated that he first saw the deceased on that morning when he came to the saloon.    The defendant came to the saloon first, and was drinking off and on all day.    He spent the larger part of the day in the saloon.    A large crowd were present a large part of the time, and were drinking considerably.    The house was a single story frame building, with a family grocery department in front, and a sa-

loon in the rear, divided by a partition about the centre of the room. This partition contains two doors, one behind the counter on the west side, for the use of employes, and the other about the centre of the room, between the counter and the east wall. The counter is on the west side, and extends the length of the room. There is a door on the north or front end of the house; another in the east side of the saloon, and a window in the south end of the saloon room. Lige Wilkins and Lowe were in the saloon, and the defendant in the family grocery department, when the deceased rode up. The witness did not know whether or not Bob Embry, Bob Ladd or Will. Winton were then about the house or not; nor did he know who were about the front door when the deceased rode up. He did not hear the deceased ask any one to fasten his slicker, nor did he see any one button it. He did not hear the deceased say that he was going home, nor did he hear the defendant say that he could whip any man who had anything against him. He did not hear the deceased say: "George Moore, G—d d—n you, I am the change for you," nor did he see any one push the deceased's horse and tell deceased to go home. The defendant and the witness had a difficulty once, but witness could not say that he was expecting a difficulty with the defendant on that day. He did not know what was going to happen. He did not see Sam. Jackson, nor did he know where Phelps was when Lindley and the defendant were standing together. Witness told the defendant in the saloon that if he got into a difficulty with the deceased, the deceased would make it serious, and the defendant replied that it did not "make a d—d bit of difference." Witness did not go out when he first saw the party at the window, nor did he go out until he heard cursing at the back part of the house. When he did go out he saw the deceased and Mal. Wood at the horse rack. Bob and Jimmie Walden, Riley Lowe, Alex. Ablowich, Rob. Long, and others were there. The deceased had started off with Mal. Wood, Wood telling deceased to go home. The first of the difficulty the witness heard on getting out, was the defendant calling the deceased a d—d son of a b—h. The deceased then started back. The defendant said nothing more until the deceased got near to him. The deceased approached the defendant in a pretty fast walk, and rode up against the defendant. From the horse's shoulder the defendant started back and said to the deceased: "Don't you come on me with that loaded quirt." The defendant had retreated from the window at the

south end of the house around the southeast corner before he shot. The defendant was at the horse's head when the deceased, with the quirt held in a striking attitude in his right hand, was grabbing with his left at the pistol. Witness did not see the deceased get hold of the pistol. He did not think the defendant's first shot struck the deceased. After the shot fired by Phelps the witness saw blood running from the mouth of deceased. The witness saw the defendant, during the day, throw a roll of money on the counter. He did not remember the hour nor who was present when the defendant said that he could kill a man and get a thousand miles away before being caught.

The horse-rack was south of the saloon, and was on the deceased's most direct route home. The witness had not seen Mal. Wood sooner than stated on the day of the killing. The deceased, Mal. Wood and LeRoy James would, in going out of Commerce toward their homes, go out the same way. There is a public square in Commerce. The saloon building fronted north from the south side of the square. The lane, through which the deceased's route home led, ran by Ablowich's store. A vacant space on the west separated the saloon building from Ablowich's house. The witness further described the topography of the village. The killing occurred late in the afternoon.

Mal. Wood testified, for the State, that he saw the shooting. After he had fixed to go home, he saw the deceased at Ablowich's store, talking to that gentleman. He proposed to the deceased to go home. Deceased agreed, and turned his horse for that purpose. Just at this time the defendant came around from the east side to the south end of Blair's saloon, and said to the deceased: "Sam., come here." The deceased asked: "What do you want?" The defendant repeated: "Sam., come here." The deceased replied: "I am not afraid to come." The witness remained where he was, and saw two or three parties join the defendant, who was leaning against the south end of the house. The defendant then asked the deceased if he had anything against him, and deceased replied: "No; have you anything against me?" The defendant replied: "No; but do you think I am afraid of you? I can whip you." The deceased replied that since there was nothing between them, a difficulty was unnecessary. To this the defendant replied: "It don't make any difference; I can whip you." The deceased replied that he would give him the best he had, and rode to the horse rack and dismounted. Here the witness joined the deceased, and told him not to go

back, but to go home. The deceased then remounted and started, when some one hallooed to him, and he went back. The party at the south end of the Blair house retreated, with some rough words, and two were cursing. Witness did not recognize the parties cursing. Thereupon the deceased turned and looked at the witness, and the witness said to him: "Come on, let's go home." He turned, and rode with witness as far as Cox's fence, near the horse rack, when some one exclaimed: "Go, you G—d d—d cowardly son of a b—h!" The deceased thereupon remarked: "I will go back or die." He and the witness were then forty or fifty yards off, en route for home. When the deceased started back he said nothing more to the witness. When he got within twenty or thirty feet of the defendant, the latter drew his pistol and presented it at the deceased. When near enough, the deceased grabbed at and caught the barrel of the pistol with three fingers. The parties then passed around the house out of sight of the witness, and witness heard a pistol fire towards them. He then saw Phelps take deliberate aim with a pistol held in both hands, and fire towards the parties. The witness heard four shots. His horse frightened and ran around the west side of the house with the witness, and brought him in sight of the party. The deceased was then down, with his clothing on fire. The defendant and Phelps went around the corner and passed out the north side of the square.

When the deceased got off his horse at the rack, the witness told him not to go and fight those boys—that they were all drunk. Rob. Long was about the vicinity. When the witness first saw the deceased at Ablowich's store he told him to wait until he, witness, could go to Rutland's store to buy some thread. He found the deceased where he left him, on his return. When the defendant first called "Sam. Boyd," he was alone, but there were two or three voices at the corner of the saloon. When the deceased and the witness started to ride off the last time, the defendant, Lindley, Phelps and several others were at the corner of the saloon. Some one said, as the deceased started back once: "G—d d—n him, let him come." The witness did not know who made this remark.

The cross-examination of this witness elicited but little, and no material change or addition to his testimony in chief. He stated, however, that he at no time saw the deceased with his quirt reversed. He could not see deceased's right arm. He

did not hear the defendant say: "Don't come on me with that loaded quirt."

Alex. Ablowich testified, for the State, that he saw the killing. His business house was on the south side of the square. Blair's saloon was ten or twelve feet east of the witness's store. A blacksmith shop stood about twenty feet still further east. The horse rack was thirty or forty feet from Blair's saloon, and fifty feet from Cox's fence. When the difficulty began last, or was renewed, Phelps was southeast of the saloon. The defendant, Lindley, the Waldens, Rob. Long, Winton, LeRoy James, and Mal. Woods were about. The parties first fell out in the saloon, in which the witness was at the time. The deceased rode up to the front door and called for something. Phelps, defendant and many others were in the saloon. The defendant made some remark, at which the deceased took offense. He, however, rode off presently, but soon returned, and further words passed between him and the defendant. The witness thought the deceased was angry. The deceased again left, and rode around the west side of the house. The witness followed to get him off home, to avoid a difficulty, which he feared would ensue. The defendant and Phelps soon came around the southeast corner of the house, the defendant stopping at the end of the saloon. Defendant and deceased began cursing each other. They cursed and abused each other, and dared each other to fight, for some time. Finally, the deceased turned from near Cox's fence, and the defendant again dared him, calling him a son of a b—h, both being angry. Phelps had his coat off, but Lindley made him put it on. The deceased rode at the defendant briskly. The defendant hallooed at him not to run on him with the quirt, but the deceased rode on, and the defendant fired. Phelps then fired, and the deceased fell against the defendant and rose to his feet. They were then three or four feet north of the corner, and on the east side of the saloon. They, the deceased and defendant, began scuffling; the former threw the defendant and went over him, when the defendant fired again. Then another shot was fired by some one, but the witness could not say who. He thought that the defendant missed the deceased both times he shot. The defendant was retreating when he fired the first shot. Witness did not see any lick struck by the deceased before this first shot was fired by the defendant. The defendant fired a third shot at the deceased while the latter was down on his "hunkers"

(knees?).   The defendant and Phelps then mounted their horses and rode off.   The deceased had three shots in his body, and one glancing shot.   Two holes were in his back, one about his spine, one between the shoulders, and one glancing shot on his left side.

Cross-examined, the witness stated that the deceased first got mad when the difficulty began in the house, at some careless answer of the defendant's in reply to the deceased's call for something.   Some words passed, when the deceased rode off. He soon came back, and rode off again towards the rear of the saloon.   After the defendant went out, he and the deceased en-- gaged in uninterrupted abuse of each other.   The deceased would ride off a step or two, stop, and the cursing and abuse would continue.   There was a great deal of excitement about. Witness did not see Mack Blair outside of the house.

William Winton testified that the first he saw of the difficulty was when the deceased started towards the defendant.   The narrative of this witness amounted in substance to this:   When he reached the neighborhood of the parties, the deceased had started back toward the defendant.   When about twenty steps apart, the defendant called the deceased a d—d cowardly son of a b—h.   The defendant drew his pistol from his breast pocket just before the deceased reached him.   The deceased had his quirt reversed and raised in his hand in a striking attitude. The quirt was held in this position before the defendant drew his pistol, but the pistol was drawn a little before the deceased reached the defendant.   The deceased struck at the defendant with the quirt and grabbed at the pistol, and the defendant fired about the same tim ', or very soon afterward.   The deceased struck the defendant again, and was grabbing at the pistol when Phelps fired.   All the parties were drunk.   The defendant fired four shots; the first as the deceased came up and struck with the quirt; the second as they fell in the scuffle; a third time during the scuffle; the fourth after Boyd was down, dead or dying.   This last shot struck the deceased between the shoulders.

Over objection by the defense, the witness was permitted to testify in regard to the defendant and Phelps, that before the shooting they said something about leaving.   They were blowing around in a manner customary with drunken men, saying they could whip any man in Commerce.   They said that if they left they did not want to leave for nothing.   Nothing of a material nature was developed by the cross-examination.   The defendant

and Phelps left town with their pistols in their hands, the defendant hallooing "hurrah for h—ll!"

E. Wilkins, barkeeper in the Blair saloon, testified, for the State, that the defendant first came into the saloon about six o'clock a. m., on the day of the killing. Mack Blair asked him if he was taking his first drink. He replied, "Yes, but woe unto my last." Over objection, the witness was permitted to testify that defendant then and there said that he had killed one man, and could kill another and get a thousand miles off without being molested. He exhibited money, and said that he had enough to get off on. The witness afterwards saw him swapping horses. He was in the saloon off and on all day. Phelps was with him part of the time. He, Phelps and Joe Swain were in the saloon together about three o'clock p. m. Swain invited the defendant to drink. The defendant refused, and Swain called him a "hair-lipped fool." The defendant started at Swain with his hand in his breast pocket, but Phelps interfered, saying: "What are you getting drunk for? We don't want to camp on the trail to-night. This is not the man we are after." This witness detailed the transactions immediately preceding the shooting very much as they had been described by other witnesses. He had closed the door and was inside when the shooting occurred, and saw nothing of it.

Cross-examined, the witness stated that he did not testify on the examining trial, though he was at that time in Commerce. He first told what he knew of the affair shortly after it occurred. He told Mr. Jackson two or three weeks before this trial. He discussed it with Mack Blair the day after it happened, but had never done so since. He asked Mack why the defendant talked to him as he did, and Mack said that he supposed it was because of a row they had some time before. Witness worked for Bob Blair at the time. Mack Blair did not tell the witness that his purpose in telling the defendant that the deceased would give him a serious row if he got into one, was to encourage a difficulty between the two. The witness did not tell the defendant that the deceased was the best man and would whip defendant in the event of a fight. In the conversation between the defendant and Phelps, at the time defendant started at Swain, the defendant said to Phelps: "What are you going back on me for?" Phelps replied: "I am with you and will back you." The cross-examination, though rigid and exhaustive, disclosed nothing else material.

Asa Jernigen testified, for the State, that on Christmas, 1882, and for three or four days in January, 1883, he was a clerk in Donaldson's saloon, in Commerce, Hunt county, Texas. On Christmas night the defendant was in the bar at Donaldson's, drinking, when the deceased came in and ordered a drink. The defendant then remarked to the deceased: "You cannot drink here, by G—d; I am drinking here." The deceased replied: "That don't make a d—d bit of difference; I can drink." He followed this with the further remark: "You have been in the habit of running over men, but you can't run over me. If you want to raise a row with me, you are sure to get it." The witness engaged the deceased in conversation, to keep down a difficulty, and did not know what the defendant said, who was then engaged in conversation with Bud Jernigen, another bartender.

The witness was in town during the day of the killing, but did not see the shooting. He was present when the defendant tried to trade horses with Henry Rector, just before the killing. John Lindley was with the defendant at the time. The defendant remarked to the witness that it was a good horse he was trying to trade for; that he had been arrested for nothing, and wanted a horse he could get off on; that he had just set out to take Christmas, and wanted the witness to stay with him; that Lindley was going to stay with him; that with that horse he could get into the brush and escape all the officers in Commerce; that, when he left, he was going to leave on the jump, and not for nothing. The witness then went home, and in a short while heard the shooting.

Bud Jernigen testified, for the State, that he was clerking at Donaldson's saloon during Christmas week, 1882, but had no recollection of seeing the defendant and the deceased in the saloon together at any time during that week.

Hix Nowell testified, for the State, that he was the justice of the peace of the Commerce beat in January, 1883. He saw the defendant and Phelps in Commerce on the day of the killing, at about half-past one o'clock. Moore, the defendant, said to him: "Halloo, Hix! what are you doing here?" Witness replied: "I am bumming." The defendant answered: "I am bumming too," and then asked witness if he would be in town all day. The witness replied: "No, I am going to Greenville, but will stay if you have any business." The defendant replied: "No, I have none; but we boys will raise hell here to-day if you leave." The witness replied: "That's nothing new; you boys.

generally do that, anyway." On Saturday night before Christmas, while the defendant, LeRoy James and Joe Swain were drinking together in Donaldson's saloon, the witness heard the defendant say to them: "I have been arrested here several times for nothing, and don't propose to be arrested again. If so, it won't be for nothing."

Deputy sheriff Harris testified that he hunted for, but could not find, the defendant and Phelps in Hunt county, in January, after the killing. During the same month he found their horses in Benton county, Arkansas.

Sheriff Ross testified that the defendant and Phelps were delivered to him by the sheriff of Benton county, Arkansas, in January, 1883.

The testimony in chief for the prosecution was closed at this point.

Robert Walden testified, for the defense, that the defendant was his brother-in-law. He saw the shooting. He lived about one hundred yards from Blair's saloon. He went to the saloon in the afternoon, shortly before the difficulty. He saw the defendant, Lindley and Phelps go into the saloon just before he got to it. Witness went in at the back door, and into the front room. Mack Blair was in there. The witness then saw the deceased coming toward the saloon from Donaldson's saloon. The deceased rode up to the front door and requested the witness to button his slicker; which witness did. About that time the defendant, who was in the house talking to the crowd, remarked: "I can whip any G—d d—d man who has anything against me." The deceased replied from the front door: "By G—d, I am change for you," and started to dismount. The witness pushed him back on his horse and told him to go off. The narrative of this witness as to the incidents immediately preceding and at the time of the shooting, was very much the same as that of other witnesses, except that he said that the deceased struck the defendant a blow over the head with his quirt just prior to the first shot, and said, just before the defendant drew his pistol: "If you have arms about you, now is your time to draw." At the time of the first shot, which was fired by the defendant, the defendant was retreating, and the deceased was advancing, with his quirt raised in a striking attitude. The witness heard "the boys" talking in the saloon, but heard Lindley say nothing about the deceased. All hands, except the witness, were drunk, Lindley more intoxicated than any of the others. Mack

Blair was not in sight after the beginning of the fight. He, Mack Blair, ran into the house when the first pistol fired, and closed the door.

LeRoy James was the next witness for the defense. After describing the positions of the various parties at the time, he stated that when the defendant called the deceased a d—d cowardly son of a b—h, the latter rode at the defendant with his quirt uplifted in a striking attitude. He rode up against the defendant before the latter, having called to the deceased not to run on him with that loaded quirt, drew his pistol, and, as the deceased struck at the defendant and caught at the pistol, the defendant fired the first shot. Phelps then fired. The residue of the testimony of this witness was consistent with that of other witnesses who testified as to the occurrences immediately attending the killing. When the defendant called the deceased a son of a b—h, the latter said he would go back or die.

Cross-examined, the witness stated, over defendant's objection, that on the night of Christmas eve he heard the defendant say: "We have been arrested here and have had to pay money for nothing, and I am going to leave this country." He also said "Phelps shall not be arrested." Phelps was then in some kind of a row with Swain.

The testimony of James Walden was the same in effect as that of Robert Walden, from the time that the defendant remarked in the house that he could whip any man who had anything against him. To the remarks: "I am change for you," this witness said that the deceased prefixed the words "you are a liar." This witness stated further that when the deceased rode to the rack and dismounted, he pulled off his gloves. Otherwise his testimony in chief was the same as that of Robert Walden.

On his cross-examination, the witness stated that the defendant shot once before the deceased knocked him down, but not before the deceased had struck at him with the quirt, which blow the defendant warded off. He asserted positively that the deceased started to get down from his horse at the front door on hearing the remarks of the defendant, but was prevented by Robert Walden.

Robert Long testified, for the defense, that he saw the deceased for the first time on the day of the killing, in Donaldson's saloon, between two and three o'clock. LeRoy James and several others were present. The witness and deceased were some

ten feet off from the bar counter when the defendant walked up to the bar counter for a drink. The deceased had his quirt in his hand at the time, and remarked: "I would like to burst this G—d d—d quirt over George Moore's head." The witness did not know that the defendant heard this remark; if he did, he said nothing. The witness shortly went to Blair's saloon, and several parties collected there. The deceased presently rode up and said something, to which the defendant responded: "Hey?" The witness did not know to whom either of them was talking. The deceased and the defendant got to cursing each other, and finally the defendant started toward the deceased, but was intercepted by Lindley, who told him to let the deceased alone, as he was drinking. The deceased left, and after awhile the witness heard him and the defendant cursing at the end of the store. He went out and found the deceased off his horse. He prevailed on the deceased to remount, and then went to talk with defendant. While thus engaged, the deceased rode up on the left side of the witness, bringing his horse's head immediately over the witness's shoulder. Witness jerked the deceased's horse back, and told him to go home. Mal. Woods then came up, and got the deceased to start toward home. The defendant then called the deceased a d—d son of a b—h. The deceased returned, with his quirt raised in a striking attitude. As he rode up to the defendant, he said: "If you have any shooting irons, it is time for you to use them." Witness tried to turn the deceased's horse, but failed, and, as he passed under the horse's neck, the deceased struck at defendant and missed him. Defendant fired, witness caught his pistol, deceased struck defendant over the head with the quirt, was fired upon by some one from behind, fell off his horse on the defendant, and then got up and clinched with him. The witness then ran behind the house, and returned just as the defendant fired the third time.

The residue of the testimony of this witness developed no material change in the general account of the fight.

Cross-examined, the witness stated that he saw a little of the quarrel between the defendant and Swain related by the witness Elijah Wilkins. He did not see Phelps take hold of defendant, nor did he hear him say to defendant, speaking of Swain, "He is not the man we are after." He saw Swain at the counter.

Robert Embry testified, for the defense, that prior to the difficulty the defendant had traded off his household property, and tried to trade off his horse, preparatory to going to his father's,

in Lampasas county.　Phelps and witness were going with him. They intended to start that day, but deferred departure because of rain.

The little of the beginning of the difficulty seen by the witness corresponded with the general detail of the other witnesses.

The witness Rector testified that on the day of the killing he traded horses with defendant, and had before heard the defendant say he was going west to join his father.

Another witness testified that, a week or two previous, the defendant told him he was going to his father, out west.

In rebuttal for the State, Mack Blair testified that he went out of the saloon soon after the fight began, and did not run back and close the door.

R. F. Harbison, in rebuttal for the State, testified that he first saw the defendant and Phelps at the blacksmith shop.　As the deceased passed them, the deceased remarked: "I'll be d—d if he can do it."　An hour or two later the witness saw the deceased at the front door of Blair's saloon, on his way home.　Parties in the saloon were talking loud and cursing.　He heard the deceased ask Bob Walden to button his slicker, but did not hear the deceased say anything else.　From where he was the witness went to his home, about one hundred and fifty yards distant, and while there heard the defendant call the deceased a d—d cowardly son of a b—h.　The deceased was then with Mal. Woods, at the corner of Cox's fence, on his way home.　He turned, raised up straight in his saddle, rode up to defendant and tried to reach the pistol.　The defendant thereupon fired.　The deceased then struck the defendant over the head three or four times with his quirt, which was a light, pine handled quirt. Thereupon Phelps fired, the deceased fell, and he and defendant clinched and scuffled.　Finally, after the deceased was down, the defendant stood over him and snapped his pistol three or four times before it fired the second time.　The deceased was fifteen or twenty steps off when defendant called him a d—d son of a b—h.

The general testimony for the defense described the quirt used by the defendant as a substantial raw-hide quirt, with a heavy raw-hide handle.

The opinion of this court discloses other matters of fact.

The motion for a new trial assailed the charge of the court as given; the action of the court, in refusing the charges asked, and assigned as error the matters involved in the questions

discussed in the opinion. The case of Phelps, indicted and convicted of murder, on an indictment based upon the same transaction, will be found at a subsequent page of this volume.

*E. W. Terhune, Perkins, Gilbert & Perkins,* and *Brooks & Looney,* filed an able and exhaustive brief and argument for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. 1. It was not error to overrule the exceptions to the indictment. All the essential elements of murder in the first degree are plainly and directly averred therein. (*Dwyer* v. *The State,* 12 Texas Ct. App., 535; *Peterson* v. *The State,* Id., 650; *Lee Walker* v. *The State,* 14 Texas Ct. App., 609.)

2. It is made to appear from a bill of exceptions that upon the trial the defendant offered to prove by several witnesses that the character of deceased was that he was a violent and dangerous man; such a man as might reasonably be expected to execute a threat made, and to press to a fatal termination a difficulty in which he might be engaged. This proposed testimony was objected to by the State, upon the grounds that it was immaterial and irrelevant; and it was rejected.

As a general rule, evidence as to the character of the person injured is inadmissible. (Whart. Crim. Ev., sec. 68; *Stevens* v. *The State,* 1 Texas Ct. App., 591.) But there is a well settled exception to this general rule. In trials for homicide, where the evidence presents the issue of self-defense, the general character of the deceased may be proved by the defendant, to show that he, the defendant, was justified in believing himself in danger of losing his life, or of sustaining serious bodily injury from the deceased. (*Horbach* v. *The State,* 43 Texas, 242; *Stevens* v. *The State,* 1 Texas Ct. App., 591; Whart. Cr. Ev., sec. 69, et seq.; 1 Whart. Am. Cr. Law, 641; *Creswell* v. *The State,* 14 Texas Ct. App., 1.

In Horbach's case (*supra*) the question of the admissibility of such evidence is exhaustively discussed, and, after reviewing the authorities, the court says: "It may be deduced from these authorities that the general character of the deceased for violence may be proved when it would serve to explain the actions of the deceased at the time of the killing; that the actions which it would serve to explain must first be proved before it would be

admissible as evidence; that if no such acts were proved as it would serve to explain, its rejection, when offered in evidence, would not be error; and that, if rejected when a proper predicate has been established for its admission, it is held to be error. This results in what has been previously attempted to be developed, that the general character of the accused for violence should be allowed to be proved, not as a substantive fact, in whole or in part abstractly constituting a defense, but as auxiliary to, and explanatory of, some fact or facts proved to have occurred at and in connection with the killing, which tend to establish a defense, when thereby aided by furnishing reasonable ground for the belief on the part of the slayer that he is then in immediate and imminent danger of the loss of his life from the attack of his assailant. It is observable in most of these cases that it is said that the evidence of character for violence is admissible in a doubtful case. It can hardly be meant by this that it is admissible only in a doubtful case of guilt; for, if that is doubtful, there is no need of proof of character, or anything else, to help out the defense. The explanation, it is submitted, is that the person killing is presumed to have committed murder by the act of killing, and in arraying the facts to establish that he acted in self-defense, if an act of the deceased at the time of the killing is of doubtful import, or is otherwise of a character that it would be explained and construed more favorably for the accused by adding to it the proof of the character of the deceased for violence, then such proof is admissible."

Applying these rules to the case we are considering, we think the court erred in rejecting the proposed evidence of the character of the deceased. Self-defense was relied upon by the defendant, and the evidence presented this issue. It was in proof that at the time of the killing, the deceased had assaulted, and was in the act of striking the defendant with a quirt. Here, then, was an act on the part of the deceased, that evidence of his character might serve to explain, and cause it to be construed more favorably for the defendant. It might add much strength to the defense, or, in the estimation of the jury, it might have no weight whatever. It was not for the trial judge, nor is it for this court, to determine the effect to be given to such testimony. That was a matter for the jury alone to pass upon, and it was the defendant's right to have the testimony submitted for the consideration of the jury, in connection with the other facts of the case.

2

3.   A few moments before the killing, defendant and deceased had exchanged angry words, and deceased had gone away from where defendant was.   One John Lindley, who was present with defendant, slapped defendant on the shoulder and told him to go ahead; that he, Lindley, was with him, and had the money to back him in whatever he might do.   This declaration of Lindley was admitted in evidence, over the objections of defendant, and this was excepted to at the time.   We think this testimony was admissible, without reference to the question as to whether or not Lindley was proved to be a co-conspirator with defendant in the commission of the homicide.   It was a statement made by Lindley in the presence of, and to the defendant. Mr. Wharton says: "If A, when in B's presence and hearing, makes statements which B listens to in silence, interposing no objection, A's statement may be put in evidence against B, whenever B's silence is of such a nature as to lead to the inference of assent."   (Whart. Cr. Ev., sec. 679.)

Upon the same principle, we think the testimony of the witness Wilkins, detailing the declarations of Phelps, made at the time of the difficulty between defendant and Swain, was competent, and that the court did not err in admitting it.   We cannot regard this testimony as objectionable upon the ground that it was irrevelant or immaterial.   It tended to establish the condition of defendant's mind, and evil intention on his part. However vague and unsatisfactory it may be to prove malice, still it cannot be said that it has no bearing in that direction, and it was for the jury to determine the consideration to be given to it in connection with the other evidence in the case.

4.   Defendant offered John Lindley as a witness in his behalf, and the State objected to the witness on the ground that said witness stood indicted for the murder of Boyd, as an accomplice with defendant, and had not yet been tried upon said charge. To sustain this objection, the State introduced the indictment against Lindley, charging him as a principal in the murder of Boyd.   This indictment was pending in the same court in which the trial of this case was progressing, and it was judicially known to the court that Lindley had not been tried upon and acquitted of the charge.   It does not appear from the record that any question was made as to the identity of the transaction for which Lindley stood indicted, with the one for which defendant was being tried.   *Prima facie*, the indictment against Lindley, we think, showed the transactions to be one and the

same, and authorized the court to so regard them, in the absence of anything to the contrary being shown. It being thus shown that Lindley stood indicted for the same murder for which the defendant was on trial, the court below held him to be an incompetent witness to testify in behalf of the defendant, and we think held correctly. "Persons charged as principals, accomplices or accessories, whether in the same indictment or different indictments, cannot be introduced as witnesses for one another; but they may claim a severance, and if any one or more be acquitted, or the prosecution against them be dismissed, they may testify in behalf of the others." (Code Crim. Proc., Art. 731.) In order to render a principal, accomplice or accessory incompetent to testify under the foregoing article, we do not think that it is necessary that the indictment against him should show that he committed the offense together with the defendant. If he is charged, as in this case, with committing it alone, we think it is competent for the State to show, *aliunde* the indictment, that the defendant was also engaged or concerned in the same act, and thus establish his incompetency to testify in behalf of the defendant.

5. Numerous objections are made by the defendant to the charge of the court. It is urged that it gives undue prominence to the question of express malice; that it assumes false hypotheses, and argues, as it were, express malice from every conceivable standpoint. We have given the charge a very careful consideration with respect to all the objections urged against it. It is quite lengthy, but we are not prepared to say that it is unnecessarily so, in view of the many questions of law presented by the evidence. It is true that upon the subject of express malice it is unusually full and explicit, and is, perhaps, obnoxious to the criticism that it gives to that question undue prominence. In the case of *Willis & Bro.* v. *McNeill*, 57 Texas, 465, "it is suggested that, if a distinct legal proposition, as applicable to the issues and evidence, is once clearly announced in the charge, its repetition may tend to impress the jury with the belief that, in the opinion of the presiding judge, the facts demand its application in the particular case, and thus their verdict may thereby be unintentionally influenced." Among other instructions upon express malice we find the following in the charge: "Express malice is a condition of the mind which is to be inferred from the existence of external circumstances, capable of proof, such as previous difficulties, deliberate preparation,

or by any other fact or circumstances connected with or attending the killing, which satisfies the jury beyond a reasonable doubt that the accused acted from a deliberately formed design and sedate mind." And again, the charge further reads: "Express malice may be inferred by the cool, calm and circumspect deportment and bearing of a party when the act is done, or immediately prior or subsequent thereto; his apparent freedom from passion or excitement; the absence of any obvious or known cause to disturb his mind or to arouse his passions; the nature and character of the act itself; the instrument used and the manner of committing the act; the declarations of the party, showing the state of his mind and the motives and purposes with which he acts; and all the other facts and circumstances connected with the transaction are to be taken into consideration by the jury in determining the state or condition of the mind at the time the determination to take life was formed. But, in the absence of any fact or circumstance in proof, which satisfies the jury beyond a reasonable doubt that the killing originated in, and resulted from, a deliberately formed design of a sedate mind, the killing would not be with express malice."

To the trained legal mind, these clauses of the charge would be properly understood and correctly construed; and as legal propositions, understood as the learned judge intended they should be, they are unobjectionable. But are they not calculated to mislead the unskilled minds of jurors—minds not educated and trained to perceive and appreciate the nice, but, at the same time, often vital, distinctions of the law? Thus, they are told that *express malice* may be *inferred* from the existence of certain facts. We understand the learned judge to mean that express malice may be evidenced by external circumstances proved to exist; that is, that certain facts and circumstances having been proved to exist, we may from these *infer* the existence of express malice. We do not construe these clauses of the charge as dispensing with the *proof* of express malice, but we are not sure but that a jury might conclude therefrom that, even in the absence of any proof of express malice, they were at liberty to *infer* or *presume* its existence from the fact of the killing alone. "Malice of all kinds must be inferred, because it consists in a quality or state of the mind, either actual or imputed." (*McCoy* v. *The State*, 25 Texas, 41.) But it can only be inferred from facts proved, and to warrant the inference of express malice there must be reasonably satisfactory proof of external cir-

cumstances manifesting an actual and deliberate intention unlawfully to take the life of another or do him great bodily harm. "The evidence of such malice which will authorize its existence to be inferred must arise from external circumstances discovering that inward intention, as lying in wait, menacings antecedent, former grudges, deliberate compassings, and the like, which are various according to variety of circumstances." (*McCoy* v. *The State*, 25 Texas, 41; *Jordan* v. *The State*, 10 Texas, 479.) While we believe the clauses of the charge which we have quoted contain correct propositions of law, we think they are fairly amenable to the criticism that the jury might conclude therefrom that they might *infer* express malice without proof of such facts as would warrant the inference.

Another objection made to the charge is, that it gives, abstractly, the law of murder in the second degree, and nowhere attempts to apply the same to the facts of the case. With reference to murder in the second degree, the charge is as follows: "If the killing is the result of a rash, hasty or inconsiderate act, done without deliberation or premeditation; or if it is the result of some sudden and unexpected quarrel, without any deliberate intention to take life, the killing is with implied malice, and the offense would be murder in the second degree. Where the killing is done under such circumstances as to constitute murder, but the design to kill does not originate in or result from a formed design, and sedate and deliberate mind, the killing would be from implied malice, and the offense murder in the second degree." This charge was not excepted to at the trial, nor did the defendant request any special charge, applying the abstract proposition of law to any particular state of facts in evidence.

Conceding that the charge is deficient in not applying the law to particular facts, it is not such a fundamental error as we would feel called upon to revise in the absence of a bill of exception, or of a special charge requested and refused. In *Hackett* v. *The State*, 13 Texas Court of Appeals, 406, it is said: "The rule upon this subject is that instructions should not be presented in the form of abstract propositions, but should be constructed upon the evidence in the particular case at bar. A state of facts should be supposed which accords with the evidence; then deduce the legal conclusions applicable to such state of facts." This rule is also announced in *O'Connell* v. *The State*, 18 Texas, 343, and in *Burrill* v. *The State*, Id., 713, and should be observed in framing

instructions to juries. We do not think that the charge upon murder in the second degree, given by the court in this case, is in full compliance with the rule above stated.

Again, it is objected to the charge that it did not fully present the law of self-defense, but restricted the right to take life to too narrow a rule. We are of the opinion that the charge of the court is objectionable in the particular named. It does not instruct the jury that the defendant may have been justified, though, in fact, there was no actual danger of death or serious bodily harm from the attack of deceased. Homicide is justifiable where the party slain is in the act of committing an unlawful and violent attack upon the party killing, such as is calculated to produce a reasonable expectation or fear of death, or some serious bodily injury; and this is true, though it should after-wards appear that there was, in fact, no danger. (*Horbach v. The State*, 43 Texas, 242; *Marnoch v. The State*, 7 Texas Ct. App., 269.) Defendant not only excepted to the charge because it did not present the law of self-defense fully, but he requested a special charge, which presented fully, and we think correctly, the proposition above stated. We think this requested charge, or a similar one, should have been given in connection with the otherwise very full and satisfactory charge of the learned judge upon the law of self-defense.

In all other respects, except in the particulars we have discussed, as far as it undertakes to expound and apply the law of the case, we think the charge of the court is correct, and not obnoxious to the objections made to it.

6. But it is insisted that the charge should have embraced the law of manslaughter, and it was excepted to by the defendant because of its omission to do so, and special instructions presenting the law of manslaughter were requested and refused. We suppose the learned judge declined charging the law of manslaughter because, in his opinion, the evidence did not demand or authorize such a charge. Without discussing the evidence in the case, we are of the opinion that the issue of manslaughter was sufficiently raised by the facts in proof to require the law of that grade of homicide to be given to the jury. Where there is evidence which presents an issue favorable to the defendant, the trial court should not disregard it, but should accord to the accused, fully and fairly, the submission of the issue to the consideration of the jury. (*Williams v. The State*, 7 Texas Ct. App., 396; *Reed v. The State*, 11 Texas Ct. App., 509; *Green v. The*

*State*, 12 Texas Ct. App., 445; *King* v. *The State*, 13 Texas Ct. App., 277.) It may be that a charge upon the law of manslaughter in this case would not have affected the result of the trial, or it may be that, had all the rulings of the court and the charge of the court been correct and unexceptionable, the verdict of the jury would have been the same as it is; still, we must look alone to the fact that the defendant is entitled to a fair and impartial trial in accordance with the fixed and certain rules of the law, and when he has been deprived of this legal right it does not rest within the discretion of this court to refuse him a new trial.

As the judgment must be reversed because of the errors we have specified, it is unnecessary that we should determine other questions presented in the record, as they are of a character that will not probably arise upon another trial of the case. The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered November 7, 1883.